# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2104

_____

| | | |
|---|---|---|
| Joseph D. Amrine, | * | |
| | * | |
| Plaintiff – Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| George R. Brooks; Thomas J. | * | |
| Brown, III; Richard Lee, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| John C. Hemeyer; Marilyn Schmutzler, | * | |
| Public Administrator and Personal | * | |
| Representative of the Estate of | * | |
| George Brooks, | * | Appeal from the United States |
| | * | District Court for the |
| Defendants – Appellees, | * | Western District of Missouri. |
| | * | |
| Twin City Fire Insurance Company; | * | |
| Missouri Department of Corrections, | * | |
| | * | |
| Interested parties. | * | |
| _____ | * | |
| | * | |
| National Association for the | * | |
| Advancement of Colored People; | * | |
| National Association for the | * | |
| Advancement of Colored People, | * | |
| Kansas City Branch, | * | |
| | * | |
| Not Parties – Amici on | * | |
| Behalf of Appellant. | * | |

_____

Submitted: January 16, 2008
Filed: April 8, 2008
_____

Before LOKEN, Chief Judge, MURPHY, Circuit Judge, and JARVEY,[1] District Judge.
_____

MURPHY, Circuit Judge.

After obtaining habeas relief from the Missouri Supreme Court, Joseph D. Amrine brought this action under 42 U.S.C. § 1983 against prison investigator George Brooks,[2] deputy sheriff John Hemeyer, prosecutor Thomas J. Brown, III, and prosecution investigator Richard Lee for their roles in the investigation which led to his conviction for murder and sentence to death. The district court[3] denied Amrine leave to file a third amended complaint and granted summary judgment to defendants Brown and Lee on the basis of prosecutorial immunity and to Brooks and Hemeyer on the basis of qualified immunity. Amrine appeals from the dismissal of his claims against Brooks and Hemeyer. We affirm.

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]Brooks is deceased, and appellee Marilyn Schmutlzer is the personal representative of his estate.

[3]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

I.

Amrine was convicted in April 1986 of the murder of fellow inmate Gary Barber in the Missouri state penitentiary. Barber was stabbed to death at approximately 2:30 p.m. on October 18, 1985 in a multipurpose room, in which he as well as Amrine and 40 to 50 other inmates were spending their recreation period. Amrine had learned from inmate Terry Russell the previous week that Barber had been spreading a rumor about having had sex with Amrine when he was passed out from drinking alcohol. When Amrine and Russell confronted Barber about the rumor, Russell and Barber ended up fighting. Both Barber and Russell were placed in detention cells and not released until 10:00 a.m. on October 18, the day of the killing.

At the time Barber was stabbed Officer John Noble was guarding a locked door which was the only entrance in and out of the multipurpose room. Amrine claims that Russell was also in the room, but appellees contend that he was not. Around 2:25 p.m. Officer Noble saw Barber chase another inmate from the back of the room to the front near where Noble was standing. Noble saw an "ice-pick type weapon" in Barber's hand and only realized that Barber had been stabbed when he collapsed near him. Noble retrieved the weapon from the floor, opened the locked door, and called for Sergeant Dobson who was stationed just outside the room. Dobson went in and ordered an immediate lockdown of the room so that no inmate could either leave or enter. Prison guidelines required officers to compile a list of every inmate in a lockdown room. The rest of the prison was also locked down.

Officer Danny Bowers entered the multipurpose room after the lockdown, and Noble pointed out Russell as the inmate whom Barber was chasing. Officer Bowers took Russell from the room out into the hall, searched him, and later escorted him to an office for questioning. The parties disagree about whether Noble correctly identified the person Barber was chasing. Noble asked the inmate Barber was chasing for his name; he replied "Russell." Brooks and Hemeyer contend, however, that it was

Amrine who answered with Russell's name. The two men apparently had similar skin tone, physical characteristics, and hairstyle. Officer Noble testified in a 2006 deposition that he was certain that the person Barber was chasing was Russell.

Appellee George Brooks, an investigator for the Missouri Department of Corrections, learned of the stabbing almost immediately. He spoke to Officer Noble, who told him that Barber had been chasing Russell, that Barber and Russell had been fighting, and that both had just been released from confinement earlier that day. Officers searched the multipurpose room several times while the inmates were still in the room, and no blood or other physical evidence was found except where Barber collapsed. Brooks performed his own search of the room and found nothing. Brooks ordered that all inmates be searched as they left the room and that the room be searched again afterwards. Officers also searched the area outside the room without success.

Brooks then went to talk with Russell. He stripsearched him, found nothing suspicious, and did not question him about the stabbing. After Brooks received information from a "confidential source" saying that he should investigate Amrine for the murder because there had been talk that morning that he would attack Barber, Brooks verified that Amrine was on the list of inmates who had been in the multipurpose room. He then spoke with Captain Hallford, an officer in the supermax unit where the incident had occurred, who told him that Amrine "was the man we should be looking [at]." Brooks then spoke with Amrine. He stripsearched him and observed a small red spot on his pants and three spots on his undershirt. Brooks took Amrine's clothing into custody; the spots appeared to be blood, but they were not fresh and were never identified as Barber's blood.

Deputy John Hemeyer, Cole County Deputy Sheriff, arrived shortly after Brooks took Amrine's clothing into custody. Hemeyer was involved in all the interviews and investigation from that point forward. Brooks and Hemeyer began to

-4-

question Amrine at 4:04 p.m. Amrine denied stabbing Barber and said that he had never gotten close to Barber so the spots on his clothing could not be from him. They terminated his interview without asking death penalty qualifying questions although Hemeyer later testified that they had intended to ask them but forgot. Amrine was placed in a detention cell for the investigation of murder.

Brooks and Hemeyer interviewed Russell at 5:35 p.m. Russell admitted to his fight with Barber the previous week. He also said that Amrine had wanted to stab Barber to pay him back for spreading rumors about him but could not do it when Barber was in isolation. Although Officer Noble had told Brooks that he saw Barber chase Russell, the two investigators did not ask Russell any questions about the stabbing. At 8:00 p.m. they took a formal statement from him. He admitted to being in the multipurpose room at the beginning of the recreation period, but he claimed that he was not inside at the time of the stabbing. He stated that he had asked Noble for permission to leave the room to get aspirin and that Noble gave him permission and opened the door for him.[4] Russell said that he went to the control center where the sergeant on duty gave him aspirin in a brown medicine bag and that he had been talking with another inmate named "Peebles" at the time Sergeant Dobson yelled for a stretcher. Russell returned to the multipurpose room, and Noble initially refused to let him enter. Russell also claimed that he asked Amrine why he had stabbed Barber and that Amrine said, "I had to do it."

Hemeyer later testified that he had had "doubts" about Russell's story at the time, but he and Brooks never located the brown medicine bag which Russell claimed to have obtained after Noble let him out of the multipurpose room. They also did not talk to the sergeant who purportedly gave Russell the aspirin, did not identify the inmate called "Peebles," and never questioned Officer Noble about the inconsistencies between his identification of Russell and Russell's claim that he was not in the room

---

[4] Noble verified that he gave Russell permission to leave the room but did not remember his actually leaving the room.

or between Russell's statement that Noble let him back in the room after the lockdown and Noble's testimony that he let no one reenter.

At 10:30 p.m. on October 18 Brooks and Hemeyer began their second interview with Amrine and asked the death penalty qualifying questions overlooked earlier. Amrine denied stabbing Barber and said that he had been playing cards with other inmates at the time of the attack. After this interview, Amrine was returned to a detention cell and remained in segregated confinement until his trial in April 1986.

On October 21 Brooks and Hemeyer interviewed inmate Jerry Poe, a schizophrenic who told them he feared for his life. Poe said that he believed that his life was threatened because of Barber's killing and that he would only give a statement if he were moved to protective custody. Poe gave a statement about the stabbing which conflicted with other evidence. He was the only witness to testify that someone wiped blood off of Barber's face with a towel, and no towel was ever found. Brooks and Hemeyer showed Poe pictures of inmates and asked him to identify the person chased by Barber. On the day of the stabbing Poe had seen the officers take Amrine from his cell, and he knew that Amrine was a suspect. When Poe was shown an eight year old picture of Amrine, he stated "I want to say that he's the one that stabbed Barber, but I can't be positive from this picture." Brooks asked him to flip over the picture where Poe saw Amrine's name, prison number, and the date of the picture. When asked if he was sure about his identification of Barber's murderer, Poe indicated that he was. After he spoke to Brooks and Hemeyer, he was transferred to the county jail.

Russell took a polygraph exam on October 22, 1985. Brooks' final investigative report indicates that Russell's polygraph was truthful, but Russell later testified at an evidentiary hearing that the polygraph indicated a conflicted answer as to whether or not he had been in the multipurpose room when the stabbing occurred. This evidence was not presented in the jury trial. The polygraph also showed that Russell gave a

truthful answer when he denied stabbing Barber. At a later evidentiary hearing Russell stated that he had not wanted to testify against Amrine at his murder trial because he did not know if Amrine had actually stabbed Barber, but that Brooks and Hemeyer threatened to charge him with the murder if he did not.

Brooks and Hemeyer also interviewed inmates Dodson, Willis, Jordan, Crume, Ball, and Hines on October 22, but none of them said they had seen the stabbing. While inmates Crume and Hines said they had seen Barber chase Amrine, Ball said that Amrine had been playing cards with him when Barber was stabbed, and Jordan said that Amrine was standing next to him at the poker table at the time.

Despite the inconsistencies, Brooks and Hemeyer did not do any further investigation before Brooks submitted his investigative report dated December 2, 1985. His report concluded that it "appeared" that Amrine had stabbed Barber. Subsequently on January 24, 1986, Brooks met with inmate Jordan who changed his earlier story and now said that Amrine had stabbed Barber and then was chased around the room by him. Brooks and prosecution investigator Lee interviewed inmate Wayne Garrison on April 8, 1986. At first Garrison said that he had not seen the stabbing but had seen Barber chasing Amrine; later in the interview he said that he saw Amrine stab Barber. Lee and Brooks interviewed inmate Henry Belk on April 9, 1986; Belk also stated that Barber had been chasing Amrine. They also interviewed Randy Ferguson, who refused to say anything on tape until prosecutor Brown agreed to drop a weapon charge against him; he then told Brooks and Lee that Amrine stabbed Barber and was the man being chased.

A jury convicted Amrine of Barber's murder on April 30, 1986, and he was sentenced to death on May 1. The state's case rested on the testimony of inmates Russell, Poe, and Ferguson. Officer Noble testified that he saw Barber chase Russell across the room, and six inmates testified that Amrine was playing poker with them in a different part of the room when the stabbing occurred. Three of those inmates

identified Russell as the person Barber had been chasing. None of the six named Amrine. Amrine's conviction and sentence were upheld on direct appeal, State v. Amrine, 741 S.W.2d 665 (Mo. 1987), and he unsuccessfully sought post conviction relief. Amrine v. State, 785 S.W.2d 531 (Mo. 1990). At an evidentiary hearing during post conviction proceedings both Russell and Ferguson had recanted their trial testimony, but Poe did not appear or testify.

Amrine then filed a federal habeas petition. After the petition was denied by the district court, Amrine obtained new counsel who located Poe and produced an affidavit from him. In that affidavit Poe completely recanted his trial testimony and swore that he had not seen Amrine stab Barber and that he had falsely identified Amrine. After reviewing the voluminous record, we concluded that Amrine had made a showing of actual innocence. Amrine v. Bowersox, 128 F.3d 1222, 1228 (8th Cir. 1997) (en banc). We therefore reversed and remanded for an evidentiary hearing in the federal district court.

On remand the district court heard testimony from Poe, as well as from Russell, Ferguson, another inmate named Kevin Dean, and Officer Noble. After finding that Poe's testimony was unreliable, the district court again denied the petition. We affirmed, based on the district court's credibility findings. Amrine v. Bowersox, 238 F.3d 1023 (8th Cir. 2001). The Missouri Supreme Court later concluded that there was clear and convincing evidence that Amrine was actually innocent of Barber's murder, granted him habeas relief, and set aside his conviction and sentence. State ex rel Amrine v. Roper, 102 S.W.3d 541 (Mo. 2003).

Amrine filed this § 1983 action in December 2004, alleging violation of procedural due process, conspiracy, and malicious prosecution. After defendants moved for summary judgment and Amrine moved to file a third amended complaint asserting a substantive due process claim, the district court denied Amrine's motion and granted that of the defendants. It dismissed the claims against Brown and Lee on

the basis of prosecutorial immunity and concluded that the actions of Brooks and Hemeyer were supported by probable cause or at least arguable probable cause and that they were therefore entitled to qualified immunity. Since Amrine had not pled substantive due process, his reckless investigation claim was dismissed, and the district court determined that Brooks and Hemeyer had not violated Amrine's procedural due process rights by bad faith withholding of exculpatory evidence from the prosecutors. Amrine appeals the summary judgment granting Brooks and Hemeyer qualified immunity on his procedural due process claim, which the district court had construed to allege a Fourth Amendment violation.[5]

Amrine contends on appeal that the only reliable evidence showed that he was actually innocent of the stabbing and that the district court erred by granting qualified immunity to Brooks and Hemeyer because they had violated his clearly established right not to be arrested without probable cause. Amrine also argues that his due process claim stated a substantive due process violation even though it was labeled as "procedural" and that the district court erred by denying him leave to file a third amended complaint. He asserts that any delay would not have unfairly prejudiced appellees and that the amendment would not have been futile.

II.

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Skare v. Extendicare Health Services, Inc., 515 F.3d 836, 840 (8th Cir. 2008). Amrine asserts that the district court erred by granting qualified immunity to Brooks and Hemeyer on his Fourth Amendment claim because they arrested him without probable cause. We review the finding of qualified immunity de novo. McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005).

---

[5]Amrine does not appeal the dismissal of his conspiracy and malicious prosecution claims.

Qualified immunity is a defense available to government officials if they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Young v. Selk, 508 F.3d 868, 871 (8th Cir. 2007) (citation omitted); see Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It "allows officers to make reasonable errors so that they do not always 'err on the side of caution'" for fear of being sued. Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir.) (citation omitted), cert. denied 519 U.S. 1011 (1996); see Davis v. Scherer, 468 U.S. 183, 196 (1984). This defense provides "ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 343, 341 (1986).

When considering whether a state official is entitled to qualified immunity, we first determine whether the alleged facts, viewed in the light most favorable to the injured party, demonstrate that the official's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If the answer to that inquiry is yes, we next ask whether the constitutional right was clearly established at the time so that a reasonable officer would have understood that his conduct violated that right. Id. at 201. Amrine submits that his placement in restrictive confinement by Brooks and Hemeyer on October 18, 1985 following their Miranda warnings was an arrest violating his Fourth Amendment right to be free from unreasonable seizure because it was not supported by probable cause.[6]

Prison officials may place inmates in segregated confinement without implicating protected liberty interests so long as the confinement does not "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of

---

[6]Count 1 of Amrine's Second Amended Complaint alleged a procedural due process claim that he had a protected liberty interest in being free from wrongful conviction and incarceration. The district court liberally construed this claim to allege a violation of Amrine's Fourth and Fourteenth Amendment rights to be free of arrest and prosecution without probable cause.

prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Sandin involved application of a state prison regulation rather than an alleged deprivation of a fundamental right, however, and we have not had occasion to consider whether placement in a detention cell within a prison on suspicion of commission of a crime qualifies as an arrest for the purpose of the Fourth Amendment's probable cause requirement. Cases from other circuits suggest that it does not because segregation is used to discipline or investigate inmates for violations of prison regulations, to protect them from the general population, or to provide a cooling off period after altercations between inmates. See United States v. Duke, 527 F.2d 386, 390 (5th Cir.), cert. denied 426 U.S. 952 (1976); see also United States v. Daniels, 698 F.2d 221, 223 (4th Cir. 1983) (segregated confinement is not an arrest for purposes of constitutional protections ); United States v. Clardy, 540 F.2d 439, 441 (9th Cir.) (placement in segregated confinement for five months until indictment not an arrest for speedy trial purposes), cert. denied 429 U.S. 963 (1976). On the other hand, the Supreme Court has suggested in dicta that a major change in conditions of confinement, such as solitary isolation, may implicate liberty interests for which minimum procedural safeguards are required by due process. See Wolff v. McDonnell, 418 U.S. 539, 571 n.19 (1974).

Even assuming that Amrine's detention by Brooks and Hemeyer on October 18, 1985 was an arrest, we find that it was supported by arguable probable cause. A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause. See U.S. Const. amend. IV; United States v. Watson, 423 U.S. 411 (1976). Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrestee has committed a crime. See Illinois v. Gates, 462 U.S. 213, 238–39 (1983); United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997). Exculpatory evidence is therefore relevant to whether an officer has probable cause. Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999). Officers are not required to conduct a "mini-trial" before arrest, but probable cause "does not exist when a 'minimal further investigation' would have exonerated the suspect." Id. at 650

(citations omitted). Officers may also be entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable. Hunter v. Bryant, 502 U.S. 224, 228–29 (1991) (per curiam). We have characterized this inquiry as whether the officers had "arguable probable cause." See Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000).

On the evening of October 18, 1985, the inculpatory evidence against Amrine included evidence of a motive to kill Barber, information from a confidential informant saying to look at Amrine for the murder, Russell's statement that Amrine had said he "had to do it," and blood spots on Amrine's clothing. The exculpatory evidence included Officer Noble's identification of Russell as the inmate whom Barber was chasing, Amrine's denial of involvement in the murder, and inconsistent evidence regarding whether Russell was in the multipurpose room at the time of the murder. Brooks and Hemeyer did not have the benefit of later discovered evidence when they made the decision to give Amrine Miranda warnings and separate him from the rest of the prison population.[7] As probable cause is determined "at the moment the arrest was made," any later developed facts are irrelevant to the probable cause analysis for an arrest. United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004).

Amrine argues that these facts are similar to the Kuehl case and that this supports his position that no probable cause existed for his arrest and qualified immunity is not appropriate. See 173 F.3d at 648–49. In Kuehl, an officer investigating an altercation spoke with the suspect for only twenty seconds, ignored physical evidence that corroborated the suspect's claim that she was the victim of an assault not the perpetrator, refused to acknowledge her explanation for why she hit the

---

[7]Amrine also cites as exculpatory evidence Russell's inconclusive polygraph response as to whether he was in the room at the time of the stabbing. Since the polygraph was taken on October 21 and Amrine's arrest occurred on October 18, the polygraph does not factor into the probable cause analysis for the arrest.

other party, ignored an eyewitness account that corroborated her statement, and omitted most exculpatory evidence from the police report. See id. at 648. We held there that in the absence of exigent circumstances an officer who unreasonably fails to investigate an incident sufficiently before arresting a suspect is not entitled to qualified immunity. Id. at 651.

Kuehl is distinguishable because Amrine was given two opportunities prior to his arrest to present his side of the story, and the physical evidence – the blood stains – tended at the outset to inculpate him. The exculpatory statement of an independent witness, Officer Noble, was tempered by inconsistencies surrounding Russell's location and by incriminating statements made to the investigators about Amrine.

Considering the circumstances and the evidence known to Brooks and Hemeyer on the evening of October 18, 1985, we conclude that arguable probable cause existed to support separating Amrine from the rest of the prison population and placing him in restrictive confinement. See Smithson, 235 F.3d at 1062. It would have taken more than a "minimal further investigation," Kuehl, 173 F.3d at 650, to sort out the inconsistencies surrounding Russell's location at the time of the murder, to ascertain the source of the blood spots on Amrine's clothing, and to interview additional witnesses who might have exculpated Amrine. Because Amrine's arrest was supported by arguable probable cause, Brooks and Hemeyer are entitled to the protection of qualified immunity on this claim.

III.

Amrine argues that the district court abused its discretion in denying him leave to file a third amended complaint. After the opposing party has filed a responsive pleading, Rule 15 states that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 557 (8th Cir.) (citation omitted), cert. denied 127 S. Ct. 189 (2006).

While we review the denial of a motion to file an amended complaint for abuse of discretion, Joshi, 441 F.3d at 555, we review the finding of futility de novo. In re Acceptance Ins. Cos. Sec. Litig., 423 F.3d 899, 904 (8th Cir. 2005). Because we find that the amendment would have been futile, we need not address whether the delay in seeking leave to file the third amended complaint could have resulted in unfair prejudice to Brooks and Hemeyer or whether Amrine sought to file a third amended complaint in bad faith. Amrine argues that the allegations in his third amended complaint state a cause of action for reckless investigation in violation of his substantive rather than procedural due process rights.

We recognized a substantive due process cause of action for reckless investigation in Wilson v. Lawrence County, Mo., 260 F.3d 946 (8th Cir. 2001), where we identified the liberty interest at stake as the "interest in obtaining fair criminal proceedings." Id. at 956 n.8, citing Brady v. Maryland, 373 U.S. 83, 87 (1963). The test for whether state officers' actions violate this protected liberty interest is whether those actions shock the conscience. Id. at 956, citing County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). Mere negligent failure to investigate does not violate substantive due process. Id. at 955. Likewise, allegations of gross

negligence do not give rise to a constitutional violation.  Id.  Where state officials "have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly."  Id. at 956.  To establish a violation of this right by a botched investigation, Amrine must show that Brooks and Hemeyer intentionally or recklessly failed to investigate, thereby shocking the conscience.  See id. at 955–56.  As the Wilson court noted, the recklessness standard has a subjective component.  Id. at 956 n.9.

In Wilson, we found that the allegations of a mentally impaired twenty year old, that a confession had been coerced from him by officers investigating a murder, met the recklessness bar if proven at trial, id. at 957, and the motion for summary judgment based on qualified immunity was therefore denied.  Officers had interviewed Wilson twice, and on both occasions he claimed that he knew nothing about the murder and that he had been shopping with his mother when the murder occurred.  A sixteen year old, also mentally impaired and known by school officials as a"very skilled liar," had told the officers that Wilson confessed the murder to him. They picked up Wilson, read him his rights but told him he was not under arrest, detained him in a windowless interrogation room for hours playing portions of the other youth's statement, told him that an eyewitness placed him at the crime scene, asked leading questions, threatened him when he gave answers inconsistent with the crime facts, and encouraged him when his answers reflected the details of the murder. Id. at 950.  Eventually Wilson confessed.  Id.[8]

A similar due process claim was raised in Moran v. Clarke, 296 F.3d 638 (8th Cir. 2002) (en banc), where a police officer brought a § 1983 case against police officials and the St. Louis Board of Police Commissioners after being acquitted of beating a man during a mistaken arrest.  He charged that other officers had intentionally set up an innocent man, and he produced evidence of "questionable

_____

[8]In 1995 the governor granted Wilson a full pardon after an independent investigation made it clear that Wilson had not committed the murder.

procedures, of pressures placed on officers to incriminate a specific person or corroborate the department's official line, of a hasty condemnation of [himself] and of improper consideration of his race" in addition to proof that defendants had "purposely ignored" exculpatory evidence. Id. at 648. We held that Moran could establish a due process violation if a jury were to find his evidence credible.

Another claim of reckless investigation, also arising in the Missouri state penitentiary and also involving investigator George Brooks, was brought in Clemmons v. Armontrout, 477 F.3d 962 (8th Cir.), cert. denied 128 S. Ct. 155 (2007). After a prisoner was stabbed to death, Corrections Officer Steigerwald identified Clemmons as the perpetrator. Although inmate Dwight Clark told Captain Gross that another prisoner named Fred Bagby was involved in the murder, id. at 964, Gross never questioned Bagby or searched his cell. Captain Gross had decided Clark was not a credible witness because Bagby's name was not on a list of prisoners who were said to be out of their cells at the time of the murder, and he prepared an investigation memorandum for investigator Brooks to that effect. Id. Brooks never interviewed Clark or Bagby.[9] Id. We concluded that the actions of the investigating officers were not intentional or reckless, particularly because Officer Steigerwald's eyewitness account had identified Clemmons as the killer. Id. at 966–67. Clemmons also had not produced any evidence that Brooks consciously sought to suppress exculpatory facts or pressured others not to investigate leads. Id. We determined that on these facts a reasonable factfinder could not find that Brooks had acted recklessly. Id.

These three cases dealing with claims of reckless investigation are instructive here. Amrine has produced no evidence suggesting that Brooks and Hemeyer attempted to coerce or threaten him as the officers did to the Wilson plaintiff. There

---

[9]Clemmons eventually succeeded in winning a new trial after filing a habeas petition claiming that exculpatory evidence had been withheld, particularly Clark's statement. Clemmons v. Delo, 124 F.3d 944, 952 (8th Cir. 1997). He was acquitted in his retrial. Clemmons, 477 F.3d at 965.

is also no evidence that the investigators purposely ignored evidence suggesting that Amrine was innocent, as occurred in <u>Wilson</u> and <u>Moran</u>. Neither was there any indication of systemic pressure to implicate Amrine in the face of evidence to the contrary as in <u>Moran</u>. The facts alleged by Amrine more closely resemble those in <u>Clemmons</u>, for Brooks and Hemeyer similarly failed in his case to follow through on investigating other leads. They did not investigate inconsistencies related to Russell's location at the time of the murder, such as trying to locate "Peebles" or the medication Russell claimed to have received. Construed with all reasonable inferences in favor of Amrine, their early focus on him and their conduct of the investigation still do not rise above negligence. Significant evidence uncovered during the investigation pointed to Amrine. That trial witnesses later recanted some testimony does not establish that the investigation into Barber's murder was reckless. Amrine, like Clemmons, offered no evidence that the investigators consciously suppressed potentially exculpatory evidence or recklessly pinned the murder on a convenient suspect.[10]

Because the facts alleged by Amrine are insufficient to make out a claim of reckless investigation by Brooks and Hemeyer, we conclude that the district court did not abuse its discretion in denying Amrine leave to file a third amended complaint asserting a substantive due process cause of action for reckless investigation. The amendment would have been futile.

---

[10]Russell later stated that, on the morning he was to testify against Amrine at trial, Brooks and Hemeyer threatened to charge him with the murder if he did not take the stand. Amrine alleges that this proves that Brooks and Hemeyer covered up exculpatory evidence. While this conduct was unlawful and reprehensible if true, it still would not establish that the investigation phase of the stabbing was reckless.

IV.

In hindsight it is certainly possible to see imperfections in the investigation of Barber's murder and to question the almost immediate placement of Amrine in detention on suspicion of murder, but the volatile circumstances in the prison setting and the more than considerable evidence implicating Amrine must be considered. Although Amrine lived under the judgment of a death sentence for many years, judicial proceedings eventually rescued him from that fate. Our en banc court determined in 1997 that he had made a showing of actual innocence sufficient to justify an evidentiary hearing, and the Missouri Supreme Court subsequently concluded that there was clear and convincing evidence that he was actually innocent of the murder.

The issues are different in this § 1983 case, and Brooks and Hemeyer had arguable probable cause to detain Amrine on the evening of October 18, 1985. They did not violate his Fourth Amendment right to be free from unreasonable seizure and are therefore entitled to qualified immunity on that claim. We also conclude that the district court did not abuse its discretion in denying Amrine leave to file a third amended complaint because it would have been futile. Accordingly, we affirm the judgment of the district court.[11]

_____

[11]Because of our conclusions, we need not address the contention that Amrine's claims are barred by collateral estoppel.