# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3107
_____

Elliot Hawkins

*Plaintiff - Appellant*

v.

Gage County, Nebraska; Brandon Schley, individually and in his capacity as
Deputy Sheriff of Gage County; John Chavez, individually and in his capacity as
Investigator for the Gage County Sheriff's Office; Rob Sandersfeld, individually
and in his capacity as Investigator for the Gage County Sheriff's Office; Tony
Shepardson, individually and in his capacity as Sergeant for the Gage County
Sheriff's Office

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Nebraska - Lincoln
_____

Submitted: May 15, 2014
Filed: July 22, 2014
_____

Before RILEY, Chief Judge, BEAM and SHEPHERD, Circuit Judges.
_____

RILEY, Chief Judge.

Elliot Hawkins was falsely accused of rape and spent seventeen days in jail as
a result. Although a police investigation by officers of the Gage County, Nebraska,

sheriff's office ultimately revealed the purported rape victim had fabricated her accusation, Hawkins brought this 42 U.S.C. § 1983 suit, alleging that both in investigating the claim and in drafting an affidavit used to obtain an arrest warrant, the officers failed to account for certain evidence which Hawkins claims was exculpatory. The district court[1] granted summary judgment in favor of the defendants—Gage County and the officers—concluding Hawkins failed to establish a genuine dispute as to the existence of a constitutional violation. Because we similarly conclude Hawkins's evidence fails to establish a constitutional violation, we affirm.[2]

## I.    BACKGROUND
### A.    Factual Background[3]
#### 1.    Initial Accusation

In the early hours of November 24, 2011, Deputy Brandon Schley of the Gage County sheriff's office responded to a request for assistance at a local hospital. Deputy Schley arrived to find Officer Morabito of the local police department investigating the recently reported rape of Jennifer Valenta, who was in the emergency room of the hospital. Deputy Schley acquired basic background information but did not interview Valenta.

Deputy Schley learned from speaking with Officer Morabito that Valenta reported the following story: Valenta met her assailant, "Elliot," a few days earlier

---

[1]The Honorable Cheryl R. Zwart, United States Magistrate Judge for the District of Nebraska, presiding with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73.

[2]We have appellate jurisdiction under 28 U.S.C. §§ 636(c)(3) and 1291.

[3]Reviewing this summary judgment, we recount the facts by viewing the evidence in the light most favorable to Hawkins, the non-moving party. See Walton v. Dawson, ___ F.3d ___, ___, 2014 WL 2053835, at *1 n.1 (8th Cir. May 20, 2014).

through her sister, Stella Dillon, and agreed to perform sexual favors for Elliot in exchange for money. Elliot picked her up the evening of the assault, driving a dark, small semi-truck, and drove her to a place near a lake. After Elliot parked and the two exited the truck, three men approached. Elliot joined the three men and ordered Valenta to disrobe. She refused but eventually complied. One of the four forced her to the ground and, despite her protests, began sexual intercourse. The four men took turns, and afterwards they used paper towels to clean up. Elliot then drove her back to town, where the two visited the local bar. Before letting her leave, Hawkins threatened to harm Valenta and her family if she contacted the police.

Valenta's sister Stella, who was also at the hospital, gave Deputy Schley a similar story and described Elliot's unique truck. Deputy Schley reported this information to Sergeant Anthony Shepardson, who, based on his familiarity with the local residents, believed "Elliot" was Elliot Hawkins.

While at the hospital, Valenta signed a hospital consent form as part of a rape kit, in which she consented to the collection of evidence, but Valenta left the hospital before the rape kit examination could be completed. On the consent form, the attending nurse recorded details of Valenta's injuries and of the purported rape. Deputy Schley was trained not to "push the issue" of a rape kit because victims were often traumatized after the rape and would often cooperate later.

Deputy Schley spoke with Valenta as she left the hospital, providing contact information and offering protection. When Deputy Schley mentioned Hawkins's full name, Valenta became noticeably more distraught. Valenta begged Deputy Schley not to speak to Hawkins, explaining he had threatened her, and she was afraid for herself and her family.

Deputy Schley and Sergeant Shepardson set out to look for the location of the alleged rape. The two officers drove around the lake they believed Valenta

referenced and found a location with beer cans, a Coca Cola bottle, and four wadded pieces of paper towels. There was also a set of dual-wheeled tire tracks consistent with Valenta's description of Hawkins's truck.

Two days later, Valenta returned to the local hospital to complete a rape kit screening but ultimately decided against it. She did get a pelvic exam, the results of which indicated nothing unusual. The undisputed record shows hospital personnel informed the local police department that Valenta declined to complete the rape kit after learning too much time had passed for it to be effective. The hospital did not notify the police department of Valenta's pelvic exam. The record does not show whether either hospital or police department personnel contacted the Gage County sheriff's office.

### 2. Additional Investigation and Arrest

Officer Morabito arranged for a recorded interview of Valenta on the evening of November 28, 2011. Valenta cooperated and told a story substantially consistent with what she told Officer Morabito at the hospital. During the interview, Valenta provided greater detail on the alleged rape itself and described for the first time the physical appearance of the other three men.

After the interview, Officer Morabito and Sergeant Shepardson encouraged Valenta to call Hawkins to obtain admissions about the events of November 24, 2011. During the recorded call, Hawkins acknowledged he and Valenta were together that night, but denied the existence of the three other men. After Valenta questioned Hawkins for a couple of minutes, the call was disconnected. Valenta tried calling Hawkins back, but he did not answer.

Valenta also provided photos Stella had purportedly taken of the injuries Valenta sustained in the rape. The photos depicted abrasions on Valenta's buttocks and vaginal area and bruises on her legs. Deputy Schley and Sergeant Shepardson

-4-

spoke about the photos with the nurse who had attended Valenta on November 24, 2011, but she could not confirm whether the photos accurately depicted Valenta's injuries because she had never seen Valenta undressed.

Early on November 29, 2011, Deputy Schley completed and submitted an affidavit and application for an arrest warrant, which the county judge granted later that day. The case was then turned over to Investigators Rob Sandersfeld and John Chavez, who thereafter assumed control over the investigation. The undisputed record shows that before submitting the warrant application, Deputy Schley had Investigators Sandersfeld and Chavez proofread the affidavit and warrant application for grammar and spelling. That evening, after the warrant's issuance, Sergeant Shepardson found and arrested Hawkins.

### 3. Post-Arrest

During Hawkins's initial post-arrest interview, Hawkins explained he and Valenta had gone to the lake on the night of the alleged rape, they had consensual sex in the sleeper berth of Hawkins's truck, and no one else had been present. Hawkins initially lied about the specific location of the encounter. When confronted with a drawing of the lake and questioned about the precise location of the encounter, Hawkins admitted he had misrepresented the location, because he had not wanted the officers to find the paper towels with his DNA on them. Hawkins also explained that after the consensual encounter, he and Valenta went to a local bar, where Valenta went to the restroom unaccompanied, and did not appear fearful or in pain.

On November 30, 2011, Hawkins requested another interview. For the first time, Hawkins explained to Investigators Chavez and Sandersfeld that a few days prior to the alleged rape, he had paid Valenta for a nude dance and that afterwards they had consensual sex. Hawkins also stated that Valenta called him several times after the alleged rape and asked the officers to confirm these calls on his phone. Rather than immediately searching the phone itself, Investigator Chavez obtained a

search warrant to search Hawkins's phone records later that day. The cell phone company did not provide these records until December 12, 2011.

The officers obtained and, on December 1, 2011, executed a search warrant for Hawkins's truck. The truck contained glass alcohol bottles, a roll of paper towels, and some condoms. The officers also interviewed Valenta's sister and brother-in-law, as well as the two people who helped Valenta after Hawkins dropped her off on the evening of the alleged rape. In large part, these witnesses did not confirm either Valenta's or Hawkins's story; however, Valenta's brother-in-law explained he called her several times on the evening of the alleged rape and she answered only a few times, always telling the brother-in-law she did not know where she was, and then would hang up.

Around this point in the investigation, Valenta identified by name Keith Parker and Naylor Lovell as two of the other men involved in the rape. Investigator Sandersfeld investigated the two men. When asked to review a photographic lineup, Valenta was unable to identify Lovell. It appears neither Parker nor Lovell was ever arrested.

None of the officers interviewed anyone at the local bar. Although one of the bartenders on the evening of the alleged assault was a former dispatcher with the Gage County sheriff's office, Investigators Chavez and Sandersfeld explained they believed interviewing Hawkins's friends at a bar he frequented might create unnecessary risks to Valenta, given Hawkins's previous alleged threats. Investigator Sandersfeld explained even if witnesses reported that "Valenta did not give an outright appearance of being in fear or pain in the bar, and/or that she had opportunities to seek help," as Hawkins claimed they would, this "could easily be explained by what she had reported as fear of Hawkins based on the recent alleged rape and threats he made against her if she were to disclose the alleged crime."

On December 5, 2011, Investigator Sandersfeld contacted state patrol investigator Jeff Ward, a sexual assault forensic specialist, to help conduct a forensic search of Hawkins's truck. Investigator Ward began assisting the Gage County investigation generally, and upon seeing the photos of Valenta's alleged injuries, Investigator Ward became suspicious, believing the locations and angles of the cuts did not coincide with Valenta's description of the assault. On December 7, 2011, at Investigator Ward's request, the photos were reviewed by a forensic nurse, who offered no opinion as to whether the wounds were self-inflicted, but believed the photos depicted recent injuries—not injuries incurred a few days earlier during the alleged occurrence. The same day, Investigator Sandersfeld sent the paper towels for DNA analysis at the University of Nebraska Medical Center (UNMC).

### 4.      Accusations Unraveled

On December 9, 2011, Investigator Ward confronted Valenta about the timing of the injuries in the photos, but Valenta's story did not change. During the interview Valenta explained that on the night of the rape, after she showered but before she went to the hospital, she had changed underwear. Investigator Chavez inspected the underwear she had changed into, finding red blood-like coloration.

On December 15, 2011, Investigator Sandersfeld received lab test results from UNMC revealing only one set of male DNA on the paper towels. The next day, Hawkins was released on personal recognizance. On December 29, 2011, Hawkins's DNA was submitted to UNMC, which confirmed on January 6, 2012, that the DNA on the paper towels was likely his.

On January 19, 2012, Investigator Ward again confronted Valenta, asking her about the DNA test results, at which point Valenta finally admitted the sex with Hawkins had been consensual and no other men were present. The officers then met with the prosecutor, who filed charges against Valenta and dropped the charges against Hawkins. After Hawkins's charges were dropped, Hawkins asked

Investigator Chavez for an apology, to which Investigator Chavez replied that "he wasn't done with [Hawkins] yet." Hawkins was never charged with any further crimes.

### B. Procedural History

Hawkins filed this 42 U.S.C. § 1983 suit against Gage County, as well as Deputy Schley, Sergeant Shepardson, and Investigators Chavez and Sandersfeld (collectively, officers) in their individual and official capacities. Hawkins alleged the officers violated (1) his due process rights under the Fourteenth Amendment "by intentionally failing to investigate leads which would demonstrate [his] innocence," and (2) his Fourth Amendment rights by omitting material facts from the affidavit used to secure Hawkins's arrest warrant.[4] On the officers' motion, the district court granted summary judgment on all of Hawkins's claims, finding Hawkins's evidence did not show a constitutional violation. Hawkins appeals.

## II. DISCUSSION

"We review de novo a grant of summary judgment, including a 'finding of qualified immunity.'" Smith v. City of Minneapolis, ___ F.3d ___, ___, 2014 WL 2535298, at *2 (8th Cir. 2014) (quoting Amrine v. Brooks, 522 F.3d 823, 830 (8th Cir. 2008)). "On summary judgment, a defendant official is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" Walton, ___ F.3d at ___, 2014

---

[4]Reviewing Hawkins's complaint, we find no reference to probable cause, false arrest, or the Fourth Amendment, though Hawkins did allege, as a factual matter, the officers submitted a deficient affidavit to obtain an arrest warrant. The district court gave Hawkins the benefit of a broad construction by reading a Fourth Amendment claim into his allegations. With the district court and both parties proceeding under this reading, we too treat Hawkins as having raised both Fourth and Fourteenth Amendment claims.

WL 2053835, at *3 (quoting Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)).  To deny the officers qualified immunity, we must resolve both questions in Hawkins's favor.  See id.

### A.    Investigation

Hawkins claims the officers' faulty investigation violated his Fourteenth Amendment rights by causing his unlawful arrest and unnecessarily lengthening his detention.  A faulty investigation by a state police officer which leads to the deprivation of a suspect's liberty only violates the Fourteenth Amendment's due process clause where the suspect shows the officers "intentionally or recklessly failed to investigate, thereby shocking the conscience."  Amrine, 522 F.3d at 834; see also Wilson v. Lawrence Cnty., Mo., 260 F.3d 946, 956-57 (8th Cir. 2001).  A recklessness standard means neither negligence nor gross negligence will do.  See Amrine, 522 F.3d at 833; Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009) ("An officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct.").  Hawkins contends the officers' investigation was reckless and conscience-shocking, relying in particular on several alleged investigative failures.  These alleged faults are instances where the officers, "[a]t most, . . . failed to investigate other leads and to explore inconsistencies in the evidence," Akins, 588 F.3d at 1184, and do not evidence conscience-shocking recklessness.

Hawkins points first to the officers' failure to speak with any witnesses at the local bar.  But the officers had no reason to expect testimony from those at the bar would be helpful.  Even if the patrons described Valenta's demeanor as Hawkins claimed, such evidence was easily explained by her fear of Hawkins's retribution should she seek help.  The decision to focus on "other investigative leads" rather than pursue tenuous, circumstantial, and potentially biased testimony from bar patrons neither shocks the conscience nor indicates recklessness.

Hawkins seems also to argue the officers should have called off their search or immediately investigated the genuineness of Valenta's photos in light of the fresh injuries depicted. However, no reasonable jury could find Valenta's falsification so apparent that officers without forensic training should have jumped to the unlikely conclusion that Valenta injured her own genitalia to perpetuate false rape allegations. Only Investigator Ward, a sexual assault forensic specialist, raised a suspicion of the photos. Even then, it required a forensic nurse to confirm that the age of the injuries appeared inconsistent with Valenta's story. If anything, the officers' reaction to Investigator Ward's suspicion of the photos demonstrates the even-handedness of their investigation: the officers soon called in a forensic nurse and then confronted Valenta.

Hawkins further argues the officers should have questioned Valenta's "vastly different versions of the event" in her November 24, 2011, and November 28, 2011, interviews, as well as her "changing . . . story over time." In reality, almost all of Hawkins's proposed inconsistencies are actually consistent details—Valenta's longer second interview enhanced and rarely amended the shorter initial interview. There are some slight variances at the margins. For instance, during the initial interview, Valenta said Hawkins sold a car to Stella, whereas in the later interview he *bought* a car from Stella. With numerous consistencies, a comparison of her interviews strengthens more than weakens her veracity, and as the district court noted, "from the officers' perspective, any distinction [between stories] could reasonably be explained by considering the emotional circumstances existing at the time" of the initial statement.

Though Hawkins alleges several other reckless failures, we have carefully reviewed these arguments and conclude they are meritless.

False accusations of sexual assault create a difficult situation for police. See Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 745 (7th Cir. 2003) (noting

"[t]he recognized difficulties in prosecuting cases of rape and assessing the credibility of putative rape victims and suspects"). Just as the officers were required to respect Hawkins's rights, they also were expected to address Valenta's allegations and the purported threats against her and to respect her rights. Still, "it is not the function of the police to establish guilt; the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts." Id. Though Hawkins points to evidence and clues he believes the officers should have utilized sooner and would have more quickly established the truth, the due process clause does not require a perfect investigation. Nor does due process hold the officers liable for taking seriously Valenta's allegations. See Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 672 (8th Cir. 2007) (explaining that despite legitimate reasons to doubt a purported victim's story, "it was not entirely unreasonable for [the officer] to credit" it, adding that "qualified immunity protects officers from these types of mistaken judgments" (internal quotations omitted)).

As in Amrine, "[t]here is . . . no evidence" the officers "purposely ignored evidence suggesting" Hawkins "was innocent" or there was "systemic pressure to implicate" Hawkins "in the face of evidence to the contrary." Amrine, 522 F.3d at 835. The record actually depicts a fairly thorough and prompt investigation which pursued inculpatory and exculpatory leads, ultimately proving Hawkins innocent of rape. With Valenta having told the truth about events up until the rape itself, and with Hawkins having initially misled the officers as to the lakeside location, the officers were forced to address a difficult question of credibility. Rather than addressing this dilemma by pursuing the marginally helpful evidence Hawkins claims the officers should have sought, the officers focused on those sources most capable of providing concrete answers—DNA analysis; forensic investigation of Hawkins's truck; physical evidence at the lakeside location; and admissions from Hawkins or Valenta. Viewing the evidence in the light most favorable to Hawkins, we find an investigation and detention which were neither reckless nor conscience-shocking. See id. at 833-34.

-11-

**B.    Affidavit**

As to Hawkins's Fourth Amendment claim for arrest and imprisonment by a deficient affidavit, the district court concluded the application for the warrant, as written, established probable cause to arrest Hawkins. Addressing Hawkins's claim that the affidavit supporting the warrant omitted material facts, the district court first noted the absence of evidence suggesting any of the named officers other than Deputy Schley, who drafted and signed the affidavit, were responsible for any of the affidavit's substantive content. The district court ultimately granted summary judgment on this claim, concluding the evidence on record failed to show Deputy Schley recklessly omitted any material facts.

On appeal, Hawkins does not challenge the district court's conclusion that the affidavit as written established probable cause. Instead, he focuses on the affidavit's omissions, arguing the officers were reckless in drafting the affidavit, thereby causing Hawkins's unconstitutional arrest.

"Franks[ v. Delaware, 438 U.S. 154, 168-71 (1978)] held that a facially sufficient affidavit [supporting a search warrant] may be challenged on the ground that it used deliberately or recklessly false statements to demonstrate probable cause." United States v. Smith, 581 F.3d 692, 695 (8th Cir. 2009). This rule applies equally to an affidavit supporting an arrest warrant, see Moody v. St. Charles Cnty., 23 F.3d 1410, 1412 (8th Cir. 1994), and "[a]n official who causes such a deprivation is subject to § 1983 liability," Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996). Hawkins claims Sergeant Shepardson and Investigators Sandersfeld and Chavez, like Deputy Schley, caused the affidavit's alleged failures. But we simply find no evidence suggesting these other three officers had any substantive input. Sergeant Shepardson was at home and off-duty during the drafting process. When the affidavit was submitted, Investigators Sandersfeld and Chavez had just been assigned to the case, and there is no evidence either investigator did more than

proofread the affidavit for grammatical errors. On this record, any alleged deficiencies are attributable only to Deputy Schley.

A Franks violation exists based on "omitted facts if (1) 'the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading,' and (2) 'the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.'" United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008) (quoting United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007)). To prove a "reckless disregard" Hawkins must "show that the omitted material would be '*clearly critical* to the finding of probable cause.'" United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993) (emphasis added) (quoting United States v. Reivich, 793 F.2d 957, 961 (8th Cir. 1986)); see also Smith, 581 F.3d at 695. Probable cause entails "'[a] probability or substantial chance of criminal activity'"—not necessarily "'an actual showing of criminal activity.'" United States v. Smith, 715 F.3d 1110, 1115 (8th Cir. 2013) (quoting United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008)).

Hawkins bases his claim on a number of omitted facts. On this record, each such omission alleged was either unknown to Deputy Schley or was known and not clearly critical to the question of probable cause. See Evans v. Chalmers, 703 F.3d 636, 651 (4th Cir. 2012) ("Affiants are not required to include every piece of exculpatory information in affidavits."). None of the omitted information known to Deputy Schley showed stark untruths in Valenta's story or called probable cause into serious doubt. See United States v. Clapp, 46 F.3d 795, 801 n.6 (8th Cir. 1995) ("[A]ffiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."). Some of the omitted facts would even have strengthened Valenta's appearance as a traumatized victim rather than detracted from it. While in hindsight, the red flags in Valenta's lies become evident, Hawkins has not shown any omissions for which

-13-

Deputy Schley fairly can be deemed reckless. Without evidence of a Fourth Amendment violation, summary judgment was warranted.

### C.    Municipal Liability

Without a constitutional violation by the officers, there can be no liability for the county.  See McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005). "Having concluded that the district court properly granted" the officers, individually, "summary judgment on qualified-immunity grounds, we likewise conclude that the county" and the officers in their official capacity were "entitled to summary judgment" on Hawkins's claims for damages.  Turpin v. Cnty. of Rock, 262 F.3d 779, 784 (8th Cir. 2001).

## III.   CONCLUSION

Finding no genuine dispute of material fact as to whether the officers committed any constitutional violations, we affirm.

_____