**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN TENNISON; ANTOINE GOFF,
　　　　　*Plaintiffs-Appellees,*

v.

CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO POLICE
DEPARTMENT,
　　　　　*Defendants,*

GEORGE BUTTERWORTH,
　　　　　*Defendant,*

and

PRENTICE EARL SANDERS; NAPOLEON
HENDRIX,
　　　　　*Defendants-Appellants.*

No. 06-15426

D.C. Nos.
CV 04-0574 CW
CV 04-1643 CW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
June 12, 2007—San Francisco, California
Submission Vacated May 21, 2008
Resubmitted September 22, 2008

Filed December 8, 2008
Amended June 23, 2009

Before: Michael Daly Hawkins, A. Wallace Tashima, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge A. Wallace Tashima

7527

## COUNSEL

Elliot R. Peters, Keker & Van Nest, LLP, San Francisco, California, for plaintiff-appellee John Tennison.

John H. Scott, The Scott Law Firm, San Francisco, California, for plaintiff-appellee Antoine Goff.

James A. Quadra, Moscone, Emblidge & Quadra, LLP, San Francisco, California, for defendants-appellants Prentice Earl Sanders and Napoleon Hendrix.

## ORDER

The Opinion filed December 8, 2008, and reported at 548 F.3d 1293, is replaced by the Amended Opinion filed concurrently with this order. With the filing of the Amended Opinion, appellants' Petition for Rehearing *En Banc* is denied as moot.

Further petitions for panel rehearing and/or petitions for rehearing en banc may be filed with respect to the Amended Opinion.

## OPINION

TASHIMA, Circuit Judge:

John Tennison and Antoine Goff (collectively "Plaintiffs") served nearly thirteen years in state prison for a murder of which both have been declared factually innocent by the courts. They were both released from custody after the district court granted Tennison's petition for writ of habeas corpus. Following their release, they filed complaints under 42 U.S.C. § 1983, alleging, *inter alia*, that San Francisco Police Department ("SFPD") homicide inspectors Prentice Earl Sanders and Napoleon Hendrix (together "Inspectors") withheld exculpatory evidence and manufactured and presented perjured testimony during the investigation and prosecution of Plaintiffs for the murder of Roderick Shannon. The Inspectors appeal the district court's partial denial of their motion for summary judgment on the basis of absolute and/or qualified immunity. We affirm in all respects.

## JURISDICTION

Although we generally do not have jurisdiction over an interlocutory appeal from the denial of a motion for summary

judgment, the denial of a defendant's motion for summary judgment on the basis of qualified immunity is immediately appealable. *Morgan v. Morgensen*, 465 F.3d 1041, 1044 (9th Cir. 2006). The district court's denial of a claim of absolute immunity also is immediately appealable. *Castaneda v. United States*, 546 F.3d 682, 687 (9th Cir. 2008). We therefore have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. *Id.*

## BACKGROUND

Construing the facts in favor of the nonmoving parties, as we must, *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005), the record establishes the following facts.

The victim in this case, Roderick Shannon, was beaten, shot, and killed. Inspectors Sanders and Hendrix volunteered to investigate the case. The evidence indicated that Shannon was chased while driving his car by a pick-up truck full of young men, and that he crashed into a fence in a parking lot after driving in reverse in an attempt to evade his pursuers. Shannon was beaten and shot when he tried to escape on foot. Shannon was driving a green Buick Skylark that he and his cousin Patrick Barnett owned.

A few days after the murder, Hendrix received a phone call from then eleven-year-old Masina Fauolo, who told Hendrix that she had witnessed Shannon's murder.[1] Masina initially called anonymously and stated that she was parked in "Lovers' Lane," when she saw numerous autos chasing another car that she knew belonged to Barnett. She followed in her car and saw the driver lose control and flee on foot. When the driver was captured by his pursuers, he was beaten and shot. The assailants fled in a pickup truck and other cars. Masina called Hendrix again, later that same day, identified herself,

---

[1]The district court and the parties refer to Fauolo and her friend, Pauline Maluina, by their first names. We do the same in order to avoid confusion.

and named some of the cars involved. Following this initial contact, Masina spoke with Hendrix every day or every other day during the course of the investigation. Hendrix took notes of a conversation with Masina that included names and other information about the incident.

Several weeks after the murder, Sanders and Hendrix requested a reward of $2,500 from the Secret Witness Program ("SWP") to encourage witnesses to come forward with information about Shannon's murder. The request stated that the murder appeared to have been gang-related, and that Shannon had been mistakenly identified as a member of a rival gang. Handwritten notations and initials on the request indicate that it was approved.

In a deposition taken in this action, Hendrix stated that he never informed the district attorney about the SWP request. Sanders did not provide a copy of the SWP request to the prosecutor, Assistant District Attorney George Butterworth ("Butterworth") either, but he asserted that there was a copy in Sanders' file, to which Butterworth had access. Butterworth stated that the request was not in the district attorney's file and had not been produced to Tennison's counsel. Butterworth did not become aware of the SWP request until he read Tennison's federal habeas petition. Public Defender Jeff Adachi, defense counsel for Tennison, stated in a declaration that he was never told about the authorization of reward money.

Early in their investigation, the Inspectors taped an interview with Masina. Masina told them that she and her friend Pauline Maluina were in a car at Lovers' Lane, at the intersection of Visitacion and Mansell, when four cars that Masina knew were from Hunters Point entered the parking lot. The cars parked in the lot, and some people exited the cars. After about ten minutes, they saw the Skylark go down the hill, on Visitacion, toward Sunnydale. Masina heard someone comment that Pat was going to pay the price now. The boys got

in their cars and started chasing the Skylark. Masina described the cars involved in the chase and the order in which they chased the Skylark.

According to her statement, Masina followed the cars and saw Shannon crash into a fence, get out of the car, and start running down the hill. Five or six boys eventually cornered Shannon in a supermarket parking lot and beat him up. She saw one boy get a gun from the trunk of a green Maverick and shoot Shannon, despite Masina's screams not to hurt Shannon. The group of boys left, and Masina went to help Shannon, who asked her to get Barnett. Masina told a woman at a video store across the street to call an ambulance and then left. Sanders showed Masina eight photos, and Masina identified Goff as the shooter and Tennison as one of the men who beat Shannon.

Hendrix also interviewed Masina's fourteen-year-old friend, Pauline. Pauline stated that she and Masina were across the street from the market when they heard a lot of screaming and saw someone being beat up. Contrary to Masina's story, Pauline denied having been at the top of the hill, which is the location of Lovers' Lane. She said that she and Masina were walking on Visitacion, that they cut through a park to get to Leland, and that was when they saw Shannon being beat up.

She also reported that she saw a car pull up next to Shannon, and that one of the boys got a gun and shot Shannon. Before the shooting, Masina was telling the group to leave Shannon alone. Pauline and Masina then ran away and "hopped on a bus."

Later, another witness, Chanté Smith, called Sanders about the murder. Sanders and Hendrix knew Smith from the neighborhood. Smith did not tell Sanders that she had witnessed the murder, which she had, but she provided Sanders with the names of people who were at the scene of the murder, includ-

ing Luther Blue and Lovinsky Ricard. She did not tell Sanders that she was a witness to the shooting because she was afraid that someone would try to hurt her. Smith did, however, tell Sanders that Tennison and Goff were not present at the murder. She also told Sanders that Ricard had shot Shannon. She described several of the cars involved in the car chase, and told him that the chase started at a 7-Eleven store on Bayshore, not at Lovers' Lane. Sanders' handwritten notes from the interview include Smith's name, phone number, and a list of names.

Sanders went to Smith's house to interview her a second time prior to trial, and she again told him about the people and cars involved in the chase, and she told him that the chase started at the 7-Eleven store. Three SFPD officers from the Gang Task Force went to Smith's house on a subsequent occasion to show her photographs of trucks to see if she recognized any of them. Undated notes, with the name "Chanté" at the top, include Smith's beeper number, names, and a hand-drawn map with other information on it.

Hendrix and Officer Michael Lewis of the SFPD Gang Task Force interviewed Ricard. Ricard denied having been present when Shannon was beaten up, and he denied shooting Shannon. Hendrix told Ricard that someone had placed him at the scene of the crime, and that Hendrix did not think that this person had a grudge against Ricard; however, Ricard denied any involvement in the incident.

At a "707 hearing,"[2] a superior court judge found that Tennison should be tried as an adult rather than a juvenile. Pauline testified at that hearing.

The day before Tennison's preliminary hearing, Butterworth confronted Pauline with the transcript of the 707 hear-

---

[2]So named because such a hearing is held pursuant to Cal. Welf. & Inst. Code § 707.

ing and told her that he was concerned about discrepancies between her testimony and the information Masina had given in her taped interview with the police. Pauline then told Butterworth and Hendrix that she actually had *not* witnessed the murder, and that she was only covering for Masina.

Butterworth and Hendrix conducted a taped interview of Pauline. Pauline again stated that she had not been present at the shooting, and that she had chosen Tennison's photo during the earlier interview because "Masina told me to pick the one that looked the biggest, and the largest one out of all the pictures." Pauline had lied because Masina had "covered" for Pauline when Pauline ran away from home several times. Pauline said that she actually had never seen Tennison before. She told Butterworth and Hendrix that she was telling the truth now because she "didn't want to get into any more trouble." According to Pauline, Butterworth became "very upset" with her after she told them the truth. Hendrix also called Masina and taped the call. These tapes were not produced to Tennison's counsel at the time and were not produced in response to subpoenas in Tennison's federal habeas case. Copies of the tapes were not produced until Tennison made a document request in this case. The copies were in Butterworth's files.

Inspector Henry Hunter later administered an inconclusive polygraph to Pauline, during which she again recanted her original story. After the polygraph, Hendrix called Masina in Samoa and had Pauline speak with Masina alone. Pauline told Masina that she had told the police that she did not witness the shooting and Masina became angry with her. After speaking with Masina, Pauline reverted to her original story and told Hendrix and Sanders in a taped interview that her statements at the 707 hearing identifying Tennison were the truth.

Hendrix placed Hunter's memo summarizing the results of the polygraph in his file and told Butterworth the results of the polygraph. Butterworth testified that he did not see Hunt-

er's memo until 2001, in conjunction with Tennison's federal habeas petition, so he never gave a copy of the memo to defense counsel. He did tell Adachi about the polygraph, but he could not recall whether he told Melton, Goff's lawyer. Adachi stated in a declaration that he was never told about the polygraph.

In a later declaration, Pauline stated that Masina had pressured her during the April 24, 1990, phone call to return to her original story, and that Masina gave her further details about the shooting. Pauline further stated that, after the polygraph, she felt pressured by Hendrix and Butterworth to revert to her previous story. In an April 2005 deposition, Pauline testified that she went along with Masina out of fear of Masina, and that she felt that Butterworth became frustrated and angry when she first retracted her story.

Pauline testified at Goff's preliminary hearing. Defense counsel, Melton, questioned Pauline about inconsistencies in her story and about her recantation, but the court found probable cause and ordered Goff to stand trial. Masina testified at Tennison's June 18, 1990, preliminary hearing. Defense counsel, Adachi, cross-examined Masina about her April 24, 1990, phone conversation with Pauline and about Pauline's recantation, but, again, the court found probable cause.

Pauline and Masina both testified at Plaintiffs' consolidated trial. The jury found Plaintiffs guilty of murder on October 3, 1990. Tennison was sentenced to a twenty-five-year to life term of imprisonment. After Goff's motion for a new trial was denied, he was sentenced to a twenty-seven-year to life term of imprisonment.

Approximately a week after the verdict, Tennison heard from friends that people named Lavista or Lavinsky Ricard and Luther Blue were involved in the incident. Tennison called Ricard himself. Tennison told Ricard that he had been convicted, and Ricard said that he knew; Ricard acknowl-

edged to Tennison that he had shot Shannon, but he did not want to mention the names of any others who were involved. At Tennison's request, Ricard provided details about the incident and agreed to contact Adachi. Tennison gave this information to Adachi the day after speaking with Ricard and gave Adachi Ricard's name, address, and phone number.

One month after the guilty verdict, Ricard was arrested on narcotics and traffic warrants by Lewis and Neville Gittens, another SFPD Gang Task Force officer, both of whom had worked with Hendrix and Sanders on the Shannon murder. Lewis and Gittens questioned Ricard about the murder in a taped interview during which he confessed to committing the murder and provided details consistent with Smith's version of events.

Lewis told Hendrix and Sanders, who were his superiors, about the confession and gave them either the original or a copy of the interview tape, and his notes from the interview. In a later deposition, Lewis stated that he talked to Hendrix the day after the Ricard interview. Lewis recalled that he spoke with Hendrix about the confession and asked him if he had heard the tape. Hendrix acknowledged that he had listened to the tape, but he told Lewis "that it was a good effort but that unless Ricard was going to be specific and bring you a weapon, bring you associates, bring you vehicles, bring you additional rounds or something tangible, it did not appear to be enough."

Hendrix later testified in a deposition that, if Lewis and Gittens had received a confession to the murder, they would have made sure the Inspectors received the information. Hendrix further testified that he did not listen to the taped Ricard confession, and he did not inform Butterworth of the tape.

But Hendrix stated in a later declaration that he learned about the tape from Sanders, who allegedly learned about the tape from Butterworth. He also testified that he "didn't care

about the tape" because it "had been taken by someone other than someone in homicide," and that he was "[a] little PO'd at Gittens and Lewis" because he felt that he and Sanders should have been contacted. He felt that, because he and Sanders were in charge of the investigation, Ricard should have spoken with them, and that the confession was not sincere because it was not given to them.

Sanders testified in a deposition that he received the tape of the confession within a day or two after it was taken, and that he began comparing the tape with the first interview of Ricard and found the two "diabolically opposed. One, he had nothing to do with it, and on this one he's — in this interview, he is confessing." Sanders further stated that the tape was "paramount," and that he and Hendrix "got a hold of [Butterworth] right away" and told him they were investigating it.

Later, however, Sanders stated that he learned about the confession from Butterworth. Sanders stated that he reviewed the confession and "conducted some follow-up investigation," but he found the confession not credible because it was not consistent with other evidence and could not be corroborated.

Without having received any information from Hendrix, Sanders, or Butterworth, and following only the tip from Tennison, Adachi obtained his own videotaped confession from Ricard, who was disguised under a hood and unidentified. However, Adachi was required to withdraw from the case because the Office of the Public Defender was representing Ricard in a different matter. Adachi was replaced by LeRue Grim, to whom Adachi gave the tape of Ricard's anonymous confession, without revealing Ricard's identity.

Tennison filed a motion for a new trial based, in large part, on Ricard's anonymous confession. On the third and final day of the hearing on that motion, Butterworth learned for the first time about the tape of the Ricard confession taken by Lewis and Gittens. Butterworth was in the cafeteria of the Hall of

Justice, working on Tennison's motion for a new trial, when Lewis and Gittens asked him what had happened to the Ricard tape. Butterworth asked what tape they were referring to, and they explained that when they interviewed Ricard, Ricard confessed that he was the one who shot Shannon. Butterworth contacted Sanders about the confession, who told Butterworth that he was not aware of any such confession.

The state trial court denied Tennison's motion for a new trial, concluding that the two taped confessions by Ricard were inadmissible, and, even if admissible, Ricard's statements "contained so many inconsistencies they could not be considered trustworthy." The appellate court affirmed both convictions.

Later, Sanders and Butterworth interviewed Smith again. Smith provided specific additional details, such as the streets on which the chase occurred, details about the cars and persons involved, where each person was seated in the cars, the words spoken during the incident, the manner in which Ricard shot Shannon, and Ricard's words after the shooting. Smith told Sanders that she did not see any females at the scene and that she did not hear any females yelling not to hurt Shannon.

Adachi stated in a declaration that he kept a "detailed inventory of every document" he received from the prosecutor or the SFPD and an index of taped witness statements provided to him by the prosecutor. Adachi further stated that he never received any information about any interview. He did not see Sanders' notes of the phone call from Smith, or other notes that included names and a map until June 2002. Adachi further stated that he never received the notes from the interviews and telephone calls with Masina and Luther Blue, and that the SFPD's "Chronological Report of Investigation" did not list the interviews.

When Plaintiffs' state habeas petitions were denied, they filed habeas petitions in federal court. Judge Wilken granted

Tennison's habeas petition, based on the suppression of material exculpatory evidence, and vacated his conviction. Goff's conviction was vacated by the Superior Court for the City and County of San Francisco. Tennison and Goff were released from custody, and both were declared factually innocent.[3]

Plaintiffs subsequently filed the present 42 U.S.C. § 1983 action against, *inter alia*, the Inspectors for allegedly withholding material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The Inspectors moved for summary judgment on the basis of absolute and qualified immunity. With respect to Plaintiffs' *Brady* claims against the Inspectors, the district court first rejected the Inspectors' argument that Plaintiffs needed to establish that the Inspectors acted in bad faith in withholding the Ricard confession. It then denied the Inspectors' motion for summary judgment with respect to the Ricard confession and the Smith interview on absolute immunity and qualified immunity grounds, and held that disputed facts regarding the SWP request precluded the grant of summary judgment on the basis of qualified immunity.[4] The Inspectors filed a timely notice of appeal. We affirm the denial of summary judgment.

---

[3]The California Victim Compensation and Government Claims Board denied Plaintiffs' claims seeking compensation for wrongful incarceration, agreeing with an administrative law judge that the findings of factual innocence were not binding and that Plaintiffs had failed to establish by a preponderance of the evidence that they did not commit the murder. The denial was upheld by the California Court of Appeal. *See Tennison v. Cal. Victim Compensation & Gov't Claims Bd.*, 62 Cal. Rptr. 3d 88 (Ct. App. 2007).

[4]The court made numerous other rulings not relevant to this appeal, including rulings on the availability of absolute and qualified immunity to Butterworth. Butterworth took an interlocutory appeal on some of those rulings, but that appeal has been dismissed, due to a settlement of Plaintiffs' claims against Butterworth.

## STANDARD OF REVIEW

The question of whether a defendant is entitled to absolute immunity is a question of law reviewed de novo. *Castaneda*, 546 F.3d at 687. The appeal of a denial of summary judgment based on qualified immunity similarly is reviewed de novo. *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003). "We construe all facts in the light most favorable to . . . the non-moving party, in deciding whether a dispute of fact is material and thereby precludes summary judgment." *Genzler*, 410 F.3d at 636.

## DISCUSSION

### 1. Duty of Police Officers versus Prosecutors

The Inspectors argue, first, that *Brady* imposes a duty on prosecutors, but not on police officers, to disclose exculpatory evidence. We reject the Inspectors' argument. We have held that

> exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them.

*United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004).

[1] The Inspectors' position also is untenable in light of the Supreme Court's admonition that "*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecu-

tor.' " *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)); *see also, e.g.*, *Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001) (stating that it was clearly established in 1979 and 1980 that police could not withhold exculpatory information about fingerprints and the conduct of a lineup from prosecutors). We accordingly reject this argument.

### 2. Bad Faith

**[2]** The Inspectors also argue that Plaintiffs must establish that the Inspectors acted in bad faith in order to establish § 1983 liability, citing *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003). The Inspectors' reliance on *Cunningham* is misplaced. *Cunningham* did not involve a *Brady* claim, but a claim under *Arizona v. Youngblood*, 488 U.S. 51 (1988), that a police officer acted in bad faith when he failed to preserve and gather potential exculpatory evidence. *See Cunningham*, 345 F.3d at 812. In sharp contrast to the instant case, there was "no question" in *Youngblood* that the State complied with *Brady*. *Youngblood*, 488 U.S. at 55. The Supreme Court distinguished a failure to disclose exculpatory evidence under *Brady*, in which "the good or bad faith of the State [is] irrelevant," from the failure "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," which does require a showing of bad faith. *Youngblood*, 488 U.S. at 57.

**[3]** Unlike *Youngblood* and *Cunningham*, which did not involve *Brady*, but instead physical evidence that was untested and whose exculpatory value therefore was speculative and unknown, Plaintiffs here allege that the Inspectors violated *Brady* by failing to disclose material, exculpatory evidence within their possession. The question accordingly is what standard of liability is required to impose § 1983 liabil-

ity on police officers for the failure to disclose material, exculpatory evidence to prosecutors.

In the criminal and habeas context, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) (stating that "*Brady* has no good faith or inadvertence defense"). Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 474 U.S. 327, 330 (1986). However, "in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." *Id.*

In *Daniels*, the Court held that a deputy's negligent act of leaving a pillow on prison stairs, causing an inmate to be injured, was not a violation of the inmate's due process rights. *Id.* at 332. Because the inmate conceded that the deputy was "at most negligent," the Court did not consider "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Id.* at 334 n.3; *see also Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007) (relying on *Daniels* to hold that "mere negligence or inadvertence on the part of a law enforcement official in failing to turn over *Brady* material to the prosecution . . . cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation," and declining to consider whether less than intentional conduct was sufficient), *cert. denied*, 128 S. Ct. 1259 (2008).

**[4]** We know, therefore, that a § 1983 plaintiff must prove a violation of the underlying constitutional right. *Daniels*, 474 U.S. at 330. In light of the fact that the suppression of *Brady*

material "violates due process . . . irrespective of the good faith or bad faith of the prosecution," *Brady*, 373 U.S. at 87, we believe that a § 1983 plaintiff should not be required to show that officers acted in bad faith in withholding material, exculpatory evidence from prosecutors.[5] Instead, a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors.

In *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007), the Seventh Circuit rejected the argument that "police officers violate due process '*only* if they deliberately withhold or conceal exculpatory evidence from the prosecutor.' " *Id.* at 631. The court relied on its decision in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), which "held that supervisors may be liable for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.' " *Steidl*, 494 F.3d at 631 (quoting *Jones*, 856 F.2d at 992-93). Because the plaintiff similarly alleged that "supervisors perpetuated other officers' misconduct," the court concluded that he had sufficiently alleged a constitutional violation. *Id.* at 632. Reasoning that "the duty to disclose was clearly established as of 1979 and 1980," the court concluded that "all of the police officers involved in this case[ ] had ample notice that the knowing suppression of exculpatory material that was in the files at the time of the trial violated the defendant's constitutional rights." *Id.*

[5] We therefore hold that a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless

---

[5]*But see Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) (relying on *Youngblood* to hold that the "bad faith standard should likewise apply to due process claims that law enforcement officers preserved evidence favorable to the defense but failed to disclose it").

disregard for an accused's rights or for the truth in withholding evidence from prosecutors. This standard is consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The level of culpability required to meet the conscience-shocking standard depends on the context. *See id.* at 850 (stating that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another"). In determining whether deliberate indifference is sufficient to shock the conscience, or whether the more demanding standard of purpose to harm is required, "the 'critical consideration [is] whether the circumstances are such that actual deliberation is practical.' " *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("*Osborn*") (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998)) (alteration in original). Thus, in *Lewis*, the Court held that, in the context of a high speed car chase, an officer could not be liable for a due process violation without a purpose to harm. *Lewis*, 523 U.S. at 836; *see also Osborn*, 546 F.3d at 1140 (where the decedent's evasive actions required the officers to react quickly, the officers could be held liable only if they acted with a purpose to harm).

The instant case, however, is more akin to cases that apply a reckless indifference standard to due process claims because the decision whether to disclose or withhold exculpatory evidence is a situation in which "actual deliberation is practical." *Osborn*, 546 F.3d at 1137. For example, in *Amrine v. Brooks*, 522 F.3d 823 (8th Cir. 2008), the Eighth Circuit discussed a "substantive due process cause of action for reckless investigation." *Id.* at 833. The court stated that the liberty interest in such a cause of action is the interest in obtaining fair criminal proceedings, pursuant to *Brady*. *Id.* The court then explained that "[w]here state officials have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." *Id.*

at 833-34 (quoting *Wilson v. Lawrence County*, 260 F.3d 946, 956 (8th Cir. 2001)).

**[6]** Here, the evidence indicates that the Inspectors acted with reckless indifference to Plaintiffs' rights. As detailed *supra*, Lewis stated in his deposition that he spoke with Hendrix about Ricard's confession the day after the interview, and that Hendrix acknowledged listening to the tape. Hendrix testified in a deposition that Lewis and Gittens would have made sure the Inspectors knew about the confession, but he stated that he did not listen to the confession and did not tell Butterworth about it. By contrast, in a subsequent declaration, Hendrix stated that he learned about the tape from Sanders, who allegedly learned about it from Butterworth. Hendrix further testified that he "didn't care about the tape" because it "had been taken by someone other than someone in homicide," and that he was "PO'd at Gittens and Lewis" because he felt that he and Sanders should have been contacted. He expressed the opinion that, because he and Sanders were in charge of the investigation, Ricard should have spoken with them, and that the confession was not sincere because it was not made to them.

Sanders testified in a deposition that he received the tape of the confession within a day or two after it was taken. Sanders further stated that the tape was "paramount," and that he and Hendrix "got a hold of [Butterworth] right away" and told him they were investigating it. Butterworth, however, gave a detailed description of learning about the tape from Lewis and Gittens while working on Tennison's motion for a new trial. In a declaration several years later, Sanders stated that he learned about the confession from Butterworth.

**[7]** Ricard described the events surrounding the murder in detail and in a manner consistent with the evidence. Lewis stated that he believed that Ricard had committed the crime. Lewis also consistently stated in his early and subsequent depositions that he spoke with Hendrix about the confession

and that Hendrix acknowledged having listened to the tape. By contrast, both Hendrix and Sanders changed their stories regarding when they learned about the confession, at first acknowledging that they had listened to the confession immediately, but, in subsequent depositions, claiming to have learned about it later from Butterworth. Hendrix's statements in his deposition that he was angry at Lewis and Gittens for taking the confession, rather than contacting him and Sanders to take it, is further evidence that the Inspectors did not act merely negligently in withholding the confession from Butterworth.

[8] Plaintiffs are not required to establish that the Inspectors acted in bad faith in withholding the evidence. They have sufficiently shown at this stage of the case that the Inspectors acted with reckless disregard for their rights and for the truth in failing to disclose the evidence to Butterworth.

### 3.    Smith's Statements

The Inspectors contend that they are entitled to qualified immunity with respect to their failure to disclose Smith's statements. They argue that Sanders discharged his duty by placing his memo regarding her statements in his file because Butterworth had access to the file, and that Plaintiffs "were aware of the same 'essential facts' " that Sanders learned from Smith. They further contend that there are no disputes of material fact regarding this claim, that they did not act in bad faith, and that it was not clearly established that a police officer violates Brady by failing to take comprehensive interview notes.

[9] Placing the notes regarding Smith's statements in the police file did not fulfill the Inspectors' duty to disclose exculpatory information to the prosecutor. Evidence that a person, known to the officers, has told the officers that they have arrested the wrong people, has identified the people involved, including the shooter, and described the cars and the

chase in a manner consistent with the evidence, should not have been buried in a file, but should have been made known to the prosecutor. Moreover, Smith's statements contradicted the account of their key witness, and the notes included a hand-drawn map of the incident, based on her statements.

The Inspectors cite *Raley v. Ylst*, 444 F.3d 1085 (9th Cir.), *amended by* 470 F.3d 792 (9th Cir. 2006), *cert. denied sub nom. Raley v. Ayres*, 128 S. Ct. 59 (2007), for the proposition that *Brady* is not violated where the defendant is aware of exculpatory evidence. *Raley* is distinguishable from the instant case. The evidence allegedly withheld in *Raley* was evidence contained in the petitioner's medical records from his pretrial confinement. We reasoned that the petitioner "knew that he had made frequent visits to medical personnel at the jail," and "knew that he was taking medication that they prescribed for him." *Raley*, 470 F.3d at 804. Thus, in *Raley*, we concluded that "[t]hose facts were sufficient to alert defense counsel to the probability that the jail had created medical records relating to Petitioner." *Id.*

A defendant's awareness of his own medical history, however, is not analogous to Plaintiffs' awareness that Smith might have information helpful to their case. Tennison and Goff had heard that Smith might have information about the shooting, but, even at Tennison's hearing on his new trial motion, Adachi thought that her last name was White. Thus, not only did defense counsel not even know Smith's name, but he certainly did not know the extent of the information that Smith had given to Sanders. Smith contradicted Masina's account of where the chase started, gave the names of many of the people involved, including Ricard, and exonerated Tennison and Goff.

In *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000), the government argued that its failure to notify defense counsel of errors in police reports before trial was not a *Brady* violation because the defendant "knew the truth and could have

informed his counsel." *Id.* at 625. We held that "[t]he availability of particular statements through the defendant himself does not negate the government's duty to disclose." *Id.* Defendants "cannot always remember all of the relevant facts or realize the legal importance of certain occurrences. Consequently, '[d]efense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government . . . ." *Id.* (citation omitted).

**[10]** Even if Goff had heard that Smith had information about the murder, this knowledge is not the same as Smith's extensive statements to the police. We agree with the reasoning of the Seventh Circuit, which rejected "as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). The court reasoned that "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant." *Id.* This is precisely the situation that Plaintiffs confronted in the instant case. Although both Tennison and Goff informally asked Smith to help them, she was unwilling to become involved because she was afraid, and because she did not want to have to testify at the trial. For the foregoing reasons, we affirm the district court's denial of summary judgment to the Inspectors with respect to Smith's statements.[6]

---

[6]We also reject the Inspectors' argument that the failure to take comprehensive notes does not constitute a *Brady* violation. The *Brady* claim is not founded on Sanders' failure to take comprehensive notes. Rather, it is clear that Smith gave Sanders extensive information regarding the murder, including information that contradicted the account of their key witness. The failure to disclose any of this information, including the fact that Smith had come forward at all, is the *Brady* violation.

### 4.  1990 Ricard Confession

The Inspectors argue that they are entitled to both absolute and qualified immunity with respect to the 1990 Ricard confession. The Inspectors argue that they are entitled to absolute immunity because they were not engaged in police-type investigative work but were acting in an advocacy role.

**[11]** Preliminarily, we have some doubt that investigative law enforcement officers would ever be entitled to absolute immunity. Because, however, of the Supreme Court's teaching that "in determining [absolute] immunity, we examine 'the nature of the function performed, not the identity of the actor who performed it,' " *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)), we nonetheless analyze this contention on the assumption that the application of absolute immunity is not barred as a matter of law.

**[12]** First, the Inspectors are not officers of the court, as are lawyers acting as prosecutors. Because they were not acting as prosecutors, or even directly assisting Butterworth in the presentation of evidence, they were not "performing the traditional functions of an advocate." *Id.* at 131. Because the purpose of absolute immunity is to protect the judicial process, rather than any actor in the process, "[t]o qualify as advocacy, an act must be 'intimately associated with the judicial phase of the criminal process.' " *Genzler*, 410 F.3d at 637 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Here, with respect to the Inspectors' actions and duties, there is no evidence in the record that the Inspectors ever engaged in conduct " 'intimately associated with the judicial phase of the criminal process.' " *Id.* Their claim of absolute immunity accordingly is rejected. Even if the Ricard confession was obtained by Lewis and Gittens, rather than Sanders and Hendrix, this does not transform the Inspectors' role into that of an advocate, rather than that of an investigator.

**[13]** The Inspectors also argue that they are entitled to qualified immunity. The threshold question in determining whether an official is entitled to qualified immunity is whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[7]

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.

*Id.* at 201-02; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

**[14]** There is no question that a constitutional right has been violated if a prosecutor fails to disclose exculpatory evidence to a defendant during the course of the prosecution. *See Brady*, 373 U.S. at 87; *see also United States v. Bagley*, 473 U.S. 667, 675 (1985) (stating that the *Brady* rule requires the prosecutor "to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial"); *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006) ("The animating purpose of *Brady* is to preserve the fairness of criminal trials."), *cert. denied*, 549 U.S. 1125 (2007).

---

[7]The Supreme Court has "withdraw[n] from the mandate set forth in *Saucier*," although the Court further stated that this "does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009).

The Inspectors argue that there was no *Brady* violation because the tape eventually was disclosed. They further argue that the failure to disclose the tape was not prejudicial because Tennison received the tape in time to use it at the hearing on his motion for a new trial. The district court rejected this argument, adopting the reasoning in its August 2003 order granting Tennison's habeas petition, which carefully explained why the delay in disclosing the Ricard confession was prejudicial to Tennison's motion for a new trial. The court pointed out that the focus of the new trial motion was the "unauthenticated and therefore inadmissible videotape of a hooded, unidentified person confessing to the shooting," and that, at the time of the evidentiary hearing on the motion, the prosecution had not disclosed to Tennison "Smith's statements to the police and Sanders' reliance on her information in the Blue interview." *Tennison v. Henry*, No. CV 98-3842 (N.D. Cal. Aug. 26, 2003) (Order Granting Tennison's Habeas Pet., at 100). The court reasoned that the judge who denied the new trial motion found that Ricard's testimony was inconsistent and uncorroborated, but the judge did not know that Ricard's testimony in fact was corroborated. *Id.* at 100-01. The district court reasoned that Goff was prejudiced by the delay in the disclosure of the Ricard confession because he could have made use of it in his state appeals and habeas petitions.

**[15]** It is true that a *Brady* violation "may be cured . . . by belated disclosure of evidence, so long as the disclosure occurs 'at a time when disclosure would be of value to the accused.' " *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (quoting *United States v. Span*, 970 F.2d 573, 583 (9th Cir. 1992)). However, Tennison did not learn about the tape until the second to the last day of the hearing on his motion for a new trial, much too late for the disclosure to be of value to him. We agree with the district court's sound reasoning that Tennison was prejudiced by the delay in the disclosure of the confession.

Similar to their argument regarding Smith's statement, the Inspectors argue that there was no *Brady* violation in their

failure to disclose the Ricard confession because Tennison and Goff knew that Ricard had bragged about his involvement in the shooting. Goff's overhearing Ricard bragging in the neighborhood, however, is not comparable to Ricard's Mirandized confession to police. Further, similar to Smith, Ricard was hesitant to become involved in the case, for obvious reasons.

The Inspectors argue that, even if a constitutional right was violated, such a constitutional right was not clearly established in 1990. The Inspectors, however, define the right too narrowly. They argue that they did not have a duty to disclose a confession that was made after a guilty verdict was rendered, that was "inherently unbelievable," and that was given by someone who earlier had denied involvement in the murder. "For a legal principle to be clearly established, it is not necessary that 'the very action in question has previously been held unlawful.' " *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Rather, "[t]he dispositive inquiry is 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.' " *CarePartners, LLC v. Lashway*, 545 F.3d 867, 883 (9th Cir. 2008) (quoting *Saucier*, 533 U.S. at 202) (second brackets in the original), *cert. denied*, __ S. Ct. __, 2009 WL 357566, (U.S. May 18, 2009).

**[16]** The Inspectors received a Mirandized confession by someone who had been named by a reliable witness, known to the officers, who recounted events surrounding the murder in detail, and whose account contradicted that of the prosecution's witnesses. The evidence certainly "undermines confidence in the outcome of the trial." *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002). Thus, it would have been clear to a reasonable officer that such material should have been disclosed to the defense. *See Barker v. Fleming*, 423 F.3d 1085, 1095 (9th Cir. 2005) ("It is well settled that evidence impeaching the testimony of a government witness falls within the *Brady* rule . . . .").

Moreover, we reject the Inspectors' attempt to dismiss their *Brady* duty by downplaying the importance of the evidence. "[I]f there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel — and not of the prosecution — to exercise judgment in determining whether the defendant should make use of it," because "[t]o allow otherwise would be to appoint the fox as henhouse guard." *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006).

**[17]** The fact that the Inspectors received the tape of the confession after the guilty verdict was rendered is immaterial because the record discloses that they received the tape while they were still involved in the new trial and post-conviction proceedings for both Tennison and Goff. *See Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under [*Brady*]."); *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (stating that "*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward"); *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (agreeing with the State's concession that the *Brady* "duty to disclose is ongoing and extends to all stages of the judicial process," where the evidence arose after trial but during direct appeal). The inconsistencies and contradictory statements in Hendrix's and Sanders' 2001 and 2005 declarations and depositions, especially seen in light of the declarations of Butterworth and Melton, establish that genuine issues of material fact remain as to this claim.[8] The district

---

[8]Lewis stated in his May 2005 deposition that he talked to Hendrix about the Ricard confession the day after the Ricard interview, in November 1990. In a January 2005 deposition, Hendrix stated that he did not listen to the confession and did not tell Butterworth about the tape, but, by contrast, in a June 2005 declaration, he stated that he first learned of the tape from Sanders, who, in turn, learned about the tape from Butterworth. In a December 2001 deposition, Sanders stated that he received the tape

court did not err in denying the Inspectors' motion for summary judgment with respect to the Ricard confession.

## 5. SWP Request

The Inspectors argue that they are entitled to qualified immunity with respect to the claim regarding the SWP request. They argue that the evidence is undisputed that no reward was ever offered or paid to any witness. They further argue that, even if the SWP request was exculpatory, they disclosed the request by placing it in their file, which was available to Butterworth. Finally, they contend that, even if the Plaintiffs had been aware of the request, it would not have affected the outcome of the case.

There is no merit to the Inspectors' argument that the evidence regarding a reward is undisputed. One need look only at the differing declarations put forth by the parties' respective experts regarding the tape of the April 23, 1990, telephone call from Hendrix to Masina. The district court correctly concluded that disputed issues of fact precluded the grant of summary judgment. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995) (holding that a district court's "determination that the summary judgment record . . . raised a genuine issue of fact" was not subject to interlocutory appeal on qualified immunity grounds); *KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008) ("Our jurisdiction is limited to questions of law, and does not extend to qualified immunity claims involving disputed issues of fact.").

---

of the confession a day or two after it was taken, but, in a June 2005 declaration, he stated that he learned about the confession from Butterworth in May 1991. Butterworth stated that he learned about the confession in May 1991, and he stated that he immediately notified defense counsel of the tape. However, Melton stated that he was never informed of the confession. The numerous contradictions indicate the existence of genuine issues of material fact that preclude summary judgment.

**[18]** The Inspectors' placement of the request in their file does not satisfy their obligation to disclose evidence to Butterworth. Masina was their key witness, so any evidence of a reward paid to her should have been made known to the prosecutor. In fact, in a June 16, 2005, deposition, Officer Morris Tabak testified that the SFPD is required to turn over all information relevant to a case to the district attorney's office, whose duty it is to then determine whether to disclose the information to defense counsel.

**[19]** If Masina had indeed been offered a reward for her testimony against Tennison and Goff, Plaintiffs should have been made aware of this fact. We accordingly reject the Inspectors' argument that it would have had no effect on the outcome of the case. The offer of a reward to a key witness is material impeachment evidence that should have been disclosed. See *Barker*, 423 F.3d at 1095 (citing *Bagley*, 473 U.S. at 683, for the proposition that evidence that a witness received an inducement from the prosecution to testify is evidence favorable to the accused); *Benn*, 283 F.3d at 1057 ("The *Brady* rule requires prosecutors to disclose any benefits that are given to a government informant . . . ."); *cf. Reynoso v. Giurbino*, 462 F.3d 1099, 1112-13 (9th Cir. 2006) (concluding that trial counsel's failure to investigate a reward offered to witnesses rendered her performance deficient and "cannot under any theory be deemed a sound trial strategy"). The district court's denial of the Inspectors' motion for summary judgment with respect to the SWP request is affirmed.

## CONCLUSION

The district court's denial of the Inspectors' summary judg-

---

[9]The Inspectors also argue that, in the § 1983 context, the court must examine the effect of each piece of evidence rather than the cumulative effect of all evidence. The district court carefully examined each piece of evidence and the circumstances surrounding the withholding of each piece separately. It also distinguished among the state actors in its consideration of § 1983 liability. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.").

ment motion is affirmed.[9] Plaintiffs-appellees shall recover their costs on appeal from defendants-appellants.

**AFFIRMED and REMANDED.**